## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

**CARL JOSEPH MCDANIEL**,

        Plaintiff,

 v.            **Case No. 14-cv-53-pp**

**WARDEN MICHAEL MEISNER,**
**KAREN ANDERSON,**
**CO BRIAN PILLAR,**
**TIMOTHY ZIEGLER, and**
**LUKAS WEBER,**

        Defendant.

---

### DECISION AND ORDER DENYING DEFENDANTS' MOTION
### FOR SUMMARY JUDGMENT (DKT. NO. 43)

---

Plaintiff Carl Joseph McDaniel is a state prisoner. On September 12, 2014, the court entered an order allowing him to proceed on Eighth Amendment claims regarding the defendants' refusal to bring trays to the plaintiff's cell so that he could eat and receive medication, despite complications from diabetes that prevented the plaintiff from navigating the stairs to the dayroom to pick up his meals and medications. Dkt. No. 15 at 8-10. The court also allowed the plaintiff to proceed on claims under the Americans with Disabilities Act (ADA) and the Rehabilitation Act (RA) against Warden Meisner in his official capacity. Id. at 9-11. On March 13, 2015, the defendants filed a motion for summary judgment, which now is fully briefed. For the reasons stated below, the court denies the defendants' motion for summary judgment.

1

# I.   FACTS[1]

### A.   Parties

The plaintiff was incarcerated at Columbia Correctional Institution (Columbia) at all times relevant to this case, and the defendants all were employees of the Wisconsin Department of Corrections (DOC) working at Columbia. Dkt. No. 44 at 1-4. Defendant Michael Meisner was the Warden; defendant Lukas Weber was the Security Director; defendant Brian Pillar was a correctional officer; defendant Timothy Ziegler was a Corrections Unit Supervisor; and defendant Karen Anderson, a registered nurse, was the Health Services Unit (HSU) Manager. Id.

### B.   Food Service and Medications

At Columbia, the food prepared for inmate meals is delivered to the housing units in bulk. Id. at 4. The inmate workers "portion the food into trays as the inmates move through the serving line" in the dayroom, where inmates receive their meals and eat. Id. "If an inmate is on cell confinement or has a medical, psychological, or security restriction to eat in his cell, he will be allowed out of his cell prior to the main meal being served." Id. at 4-5. In such a case, the inmate "picks up his tray from the dayroom and takes it back to his cell to eat the meal." Id. at 5. Then, "when the inmate's respective tier is done

---

[1] The court takes the facts from the "Defendants' Proposed Findings of Fact," Dkt. No. 44, and the plaintiff's sworn materials, including "Plaintiff's Reply to Defendant's Proposed Findings of Facts," Dkt. No. 54, "Plaintiff's Supplemental Pleading," Dkt. No. 66, "Plaintiff's Case Law in Support of Argument," Dkt. No. 67, and the "Affidavit of Carl J. McDaniel," Dkt. No. 70. The facts in this section are undisputed unless otherwise indicated.

2

eating in the dayroom, while the inmates are returning to their cells, he is allowed out of his cell in order to return his tray." Id.

"Medications are also distributed in the dayroom." Id. Inmates who need prescription medication "approach the staff member at the desk in the dayroom to receive their controlled medication; they consume it in front of staff." Id. "The staff member verifies that the inmate consumed the medication by looking in the inmate's mouth and under their tongue," and the staff member "documents in the medication treatment record whether the medication was taken or refused." Id. The defendants state that "[d]uring the time period at issue in this action, inmates were administered their controlled medication upon the completion of their meal." Id. The plaintiff disagrees, and says night or evening medications are done at 9:00 p.m. Dkt. No. 54 at 1.

"If an inmate does not come to the dayroom to receive and eat his meal and take his medications, and is not on a sanctioned medical/psychological/ security restriction" (which may include feed cell), he does not receive his meals or his medication. Dkt. No. 44 at 5.

C.    Sick Cell and Feed Cell

The procedures described above may be modified if the plaintiff is on "sick cell" or "feed cell" status. In this case, the plaintiff asserts that he asked to be on feed cell. Dkt. No. 54 at 1.

Effective January 2013, sick cell consisted of "24-hour room confinement, with inmate activity determined by HSU staff." Dkt. No. 44 at 5-6. "Unless staff decide otherwise, inmates on sick cell [were] still required to go to

3

the dayroom to pick up their meal tray," but were not allowed out of their cells to eat or to participate in recreation, library, or dayroom activities. Id. at 6. "Sick cell is typically used when an inmate is ill and possibly contagious, has been diagnosed with an illness, or waiting for test results or cultures to return." Id. When an inmate is contagious, or potentially contagious, "it is in the institution's best interest to keep them isolated and/or quarantined to the extent possible." Id.

The DOC's Division of Adult Institutions has a policy entitled "Lay-In and Sick Cell Status," which "outlines that housing unit staff shall monitor sick-cell compliance." Id. "The policy reiterates that sick cell activity will be determined by HSU." Id.

An inmate must notify unit staff (an area supervisor or unit sergeant) of his desire to go on sick cell in a timely manner. Id. Inmates usually request sick cell status "in the morning, prior to breakfast, and the inmate remains on sick-cell for the entire day (24 hours/3 meals)." Id. "If there is no indication that the inmate is abusing the status, the request is granted." Id. at 7. "If there is suspicion that the inmate is abusing the status, the request may be denied." Id.

If unit staff approve an inmate's request for sick cell, the inmate may submit a Health Service Request (HSR), asking to be seen by HSU staff. Id. If HSU sees the inmate, HSU staff will either approve continued sick cell status or the status will end after 24 hours. Id. HSU staff also determines the proper

4

level of activity for the inmate. Id. "If the inmate does not submit an HSR, the sick cell-status automatically ends after 24 hours." Id.

"While the inmate is on sick cell status, he is typically ineligible for work, school, or other programs," and he is placed on an unpaid status. Id. "If the inmate misses work or school due to illness, he is not permitted to leave his cell except to get his meal tray to take back to his cell, attend visits, showers and HSU appointments." Id. "Once the sick-cell status time is up, the inmate is allowed to return to normal daily activities." Id.

"Staff may use discretion and employ 'feed-cell' status for an inmate who may be injured, on crutches, recovering from a procedure, etc." Id. "If, for example, an inmate is on crutches, staff may deliver meals and medications to his cell." Id. at 7-8.

Unless an inmate is on Temporary Lock-Up (TLU) status, feed cell status, or staff deem it absolutely necessary, staff are "unable to deliver meals and/or medications to inmates' cells unless such accommodation is medically documented and warranted." Id. at 8. "Without such an order, inmates are required to attend meals in the dayroom like everyone else." Id. Without these restrictions, "staff would be delivering meals and medications to multiple inmates in the institution," which would be an "enormous drain on time and resources." Id.

When an inmate has a medical restriction from HSU, "the restriction is sent to the inmate's housing unit so unit staff know the specifics" of the restriction and can honor it. Id.

D.    Relevant Facts Pertaining to the Plaintiff

The plaintiff was assigned to Housing Unit 1 at Columbia from November 8, 2013, to December 11, 2013. Dkt. No. 44 at 8.

On November 25, 2013, the plaintiff filed Offender Complaint Number CCI-2013-22743, "in which he alleged that HSU refused to address his serious medical need because he had been seen three times by nursing staff regarding his foot sores, diabetic neuropathy, and swelling."[2] Dkt. No. 44 at 13. The plaintiff wanted to see a physician. Id. Columbia's institution complaint examiner (ICE) investigated the claim, contacted HSU manager defendant Anderson, obtained information regarding the plaintiff's medical care, and, on November 27, 2013, recommended that the complaint be dismissed. Id. at 14. Bureau of Health Services (BHS) Regional Nursing Coordinator Keisha Perrenoud reviewed the complaint and dismissed it on November 29, 2013, based on the ICE's findings and the fact that the plaintiff was being seen and treated.[3] Id. The plaintiff alleges that the complaint was dismissed "based on a

_____

[2] "Diabetic Neuropathy is a type of nerve damage that can occur if you have diabetes. High blood sugar can injure nerve fibers throughout your body, but diabetic neuropathy most often damages nerves in your legs and feet. Depending on the affected nerves, symptoms of diabetic neuropathy can range from pain and numbness in your extremities to problems with your digestive system, urinary tract, blood vessels and heart. For some people, these symptoms are mild; for others, diabetic neuropathy can be painful, disabling and even fatal. Diabetic neuropathy is a common serious complication of diabetes. Yet you can often prevent diabetic neuropathy or slow its progress with tight blood sugar control and a healthy lifestyle." *Diabetic Neuropathy*, Mayo Clinic, http://www.mayoclinic.org/diseases-conditions/diabetic-neuropathy/basics/definition/con-20033336 (last visited March 11, 2016).

[3] The plaintiff appealed this decision January 2, 2014, and the Corrections Complaint Examiner (CCE) recommended on January 7, 2014, that the appeal

6

procedure of 'properly dismissed at the institution level,'" and believes that the reviewing authority did not conduct an independent examination of the plaintiff's medical file. Dkt. No. 54 at 3.

According to the plaintiff, he told a correctional officer named Nelson that his diabetic neuropathy was causing him extreme pain in his feet. Dkt. No. 54 at 1. The plaintiff says he had frequent discussions with Nelson about this topic and, on November 29, 2013, told Nelson that he wanted to go on either sick cell or feed cell status. Id.

On November 30, 2013, the plaintiff submitted an HSR that said his feet and legs were too painful to go up and down stairs. Dkt. No. 70-1 at 15. At the bottom of that HSR, a staff member marked the box "Treated Today," and dated his signature December 1, 2013. Id. The plaintiff provided the court with a DOC "Progress Notes" form containing an entry dated December 2, 2013, indicating that the plaintiff went to the HSU on that date for knee pain and to evaluate use of his ACL brace. Dkt. No. 66-1 at 52. The note states, in part:

> [Patient] reports he wears his brace for strenuous exercise but has needed to wear more frequently due to "knees folding out on me, especially to go up & down stairs." [Complaints of] feet neuropathy & knee pain that is "outrageous." Then started [complaining of] wrist pain, blood sugars, requesting sick cell restriction and requesting approval to wear personal shoes "at all times." Majority of complaints have been previously addressed multiple times & [patient]

be dismissed as untimely. Dkt. No. 44 at 15. Even taking into account a four-day grace period for the prison mailbox rule, the plaintiff submitted the appeal beyond the ten-day timeframe required by Wis. Admin. Code § DOC 310.13(1). Id. The Secretary accepted the CCE's recommendation on January 10, 2014. Id. The plaintiff suggests that the untimeliness of his appeal resulted from extensive problems with his legal loan in December. Dkt. No. 54 at 3.

> informed he needs to follow institution rules. [Patient]
> is to address his concerns again [at] his next
> scheduled MD apt. While in HSU [patient] began
> asking psych and pt for orders/items & was escorted
> out of HSU due to [unintelligible]. [Patient] ambulates
> [without] difficulty, no assistive devices used.

Id. The name of the medical professional who signed this progress note is

illegible.

On December 3, 2013, Officer Nelson wrote Incident Report Number

98063. Dkt. No. 44 at 8. In the report, Nelson detailed what happened next:

> On 11-30-13 for library inmate McDaniel left the unit
> 1 in his personal tennis shoes. McDaniel sent back to
> the unit, as of November 1, he is supposed to wear
> only state issue to recreation and library. During
> lunch time inmate McDaniel has informed me with
> disrespectful manner: "I told officer in the bubble, I
> told recreation officer and I let you know that I am sick
> today." and left the dayroom. He stated that the state
> shoes are hard on his feet and he can't walk. I
> contacted HSU which was willing to see him; per HSU
> and Lt. Bredemann inmate McDaniel can come down
> to the dayroom and get the meal tray and meds. On
> 12-02-13 I contacted, spoke to nurse Christa and
> verified that McDaniel is not on sick cell. On 12-3-13
> inmate McDaniel refused to come down to the dayroom
> for breakfast. Inmate has a manipulative and bossy
> attitude. I believe he has made up this situation so he
> can get a different cell and to wear his personal tennis
> shoes, also inmate McDaniel abused his medical
> restriction: he does wear knee brace all day long and
> does not wear knee sleeve under brace to protect skin.
> Capt. Franson was notified about incident, inmate
> McDaniel placed in feed cell status. HSU was notified
> about incident.

Dkt. No. 49-3, Ex. 1002 at 2.

Defendant Security Director Weber approved Nelson's Incident Report on

December 4, 2013. Dkt. No. 49-3, Ex. 1002 at 2-3. Weber commented, "HSU to

8

follow with inmate and determine appropriate action," and referred the report to the Warden, Deputy Warden, and HSU Manager. Id.

The plaintiff also submitted HSRs on December 3, 2013, December 4, 2013, and December 5, 2013. In the first HSR, the plaintiff asked for information about the medical professionals who cleared the plaintiff on the "Problems List" for his diabetic neuropathy, knee pain, and Grave's disease. Dkt. No. 66-1 at 132. The staff member who responded was not clear about what the plaintiff was asking and instructed the plaintiff to obtain the information at the chart review that was already scheduled. Id.

The December 4 HSR deals with the plaintiff's request for orthopedic shoes, which had been "going on for years." Dkt. No. 66-1 at 131. He asks for orthopedic treatment for "diabetic feet," which he alleged were painful and swollen. Id. He represented that the state shoes didn't work and that his attempts to use personal shoes to relieve costs were denied. Id. The response informed the plaintiff that he had an appointment scheduled with the doctor soon to discuss treatments. Id. The plaintiff also noted in the HSR that he was currently on sick cell for gout pain and knee. Id.

On December 5, 2013, the plaintiff asked (in all capital letters), "WHEN DO I SEE THE MD." Dkt. No. 66-1 at 133. A nurse responded the same day that the plaintiff was scheduled to be seen by the doctor "within 10 days." Id.

Also on December 5, 2013, the plaintiff filed Offender Complaint Number CCI-2013-23502, in which he alleged that he had been refused three meals since November 30, 2013, when he requested sick cell status as a result of his

left knee issues and foot pain. Dkt. No. 44 at 22. He said staff knew about these issues. Id. The ICE investigated this claim and, on December 9, 2013, after determining no staff misconduct or work rule violations, recommended that the complaint be dismissed. Id. Defendant Warden Meisner reviewed the complaint, together with the ICE's findings and recommendation, and dismissed the complaint on December 16, 2013. Id. The plaintiff appealed the decision to the CCE, who recommended that the appeal be dismissed, and the Secretary adopted the CCE's recommendation. Id. at 22-23. The plaintiff alleges that he is not privy to any investigation conducted and never was told what information was researched or the criteria on which staff based their decision. Dkt. No. 54 at 4.

On December 6, 2013, staff noted in the unit log that the plaintiff refused to go to the dayroom to get his morning medications. Dkt. No. 44 at 10; Dkt. No. 49, Ex. 1003 at 4. The plaintiff asserts that he did not refuse meals and medications; he says that by December 6, he was weakened from missing meals and physically unable to use the stairs. Dkt. No. 54 at 2. The unit log also indicates that the plaintiff refused meals and medications on December 7, 2013, and December 9, 2013. Dkt. No. 49, Ex. 1003 at 5-6. The plaintiff asserts that he was further weakened on December 7 by missing more meals, and that by December 9, he had significant trouble staying awake and focusing due to food deprivation. Dkt. No. 54 at 2.

On December 9, 2013, defendant correctional officer Pillar authored Incident Report Number 98727. Dkt. No. 44 at 10. In the report, Pillar noted

that the plaintiff was on his third consecutive day without receiving a meal or his medication. Dkt. No. 47-1, Ex. 1004 at 2. Pillar wrote:

> Inmate McDaniel is refusing to leave his cell to eat his meals and to take his controlled medication at the appropriate times due to the continued soreness he is experiencing in his lower extremities due to his current medical conditions. Inmate McDaniel is upset because HSU has not seen him to evaluate his current conditions and he believes that they are refusing treatment because of his current legal situation involving the treatment or lack of treatment while he has been in state custody. Inmate McDaniel has been very pushy and bossy towards unit staff over the last week because of his medical conditions and he is insistent that staff place him on sick cell, or feed cell. Upon making several calls by myself and other staff who have been working on housing unit 1 to HSU inmate McDanniel does not have a medical order in place to be on sick cell or feed cell until he is seen by the medical doctor for his conditions. Upon checking with various supervisors I along with staff on the unit were instructed to treat inmate McDaniel like everyone else on the unit and if he wanted to eat his meals he was to come through the tray line like everyone else. As of the time of this report I spoke to RN Price in HSU to once again verify with them if he had been given any medical orders to be allowed to eat in his cell and she reported that he was not on any kind of restriction allowing him to do so. She also informed me that he will have to be placed on a medical meal monitoring due to his current hunger strike.

Id.

Pillar recalls informing the plaintiff that he would have to go to the dayroom in order to get his meals and medications because there was no restriction in place for the plaintiff. Dkt. No. 44 at 11.

On December 9, 2013, defendant Weber spoke with the plaintiff and asked what could be done to ease his reported pain. Dkt. No. 44 at 11. The

11

plaintiff told Weber that he had problems using the stairs due his pain and frequently missed meals because of it. Id.

The plaintiff submitted an HSR on December 10, 2013, asking for sick cell because he was "missing many meals," had "low blood sugar," and "can't get meds either." Dkt. No. 70-1 at 16. He wrote in this HSR that he was ordered by HSU to keep weight off his right wrist, and wondered, "How can I bring up a tray with bad legs too?" Id. He says, "Please give me 'sick-cell' till seen by M.D." Id. A nurse responded the same day, but only checked the boxes that the plaintiff was scheduled to be seen by the doctor. Id.

On December 11, 2013, after being seen by a doctor, the plaintiff was moved to a housing unit without stairs and with a much shorter walk to the dayroom. Dkt. No. 44 at 12.

A supervisor, B. Franson, commented on Pillar's report on December 12, 2013: "Inmate is refusing to come out of his cell over an issue with his feet. HSU is treating the inmate for his foot malady. Staff will monitor his behavior. Request copy to HSU Manager." Dkt. No. 47-1, Ex. 1004 at 2. The plaintiff disagrees with this characterization, and says that his medications were ineffective and that he also had problems with his left elbow and right wrist that were not mentioned. Dkt. No. 54 at 2.

Weber updated the report again on December 12, 2013, stating: "Inmate was seen by MD on 12-11-13;" "Diabetic care plan established;" and "Inmate will be called to HSU today to discuss hunger strike." Id. The plaintiff says he "is not aware of a 'diabetic care plan,'" and he "was not called to HSU on

December 12, or any other day to discuss 'hunger strike' because as Weber admitted, McDaniel DENIED that he was on any hunger strike." Dkt. No. 54 at 2 (emphasis in original). Copies of Pillar's report were referred to the warden, deputy warden, corrections unit supervisor, an HSU nurse clinician, and the HSU Manager. Dkt. No. 44 at 11-12.

      E.     <u>Facts Relating to Specific Defendants</u>

          1.    *Ziegler*

Unit Supervisor Ziegler remembers the plaintiff requesting sick cell status, but he does not recall the specifics of any conversations he may have had with the plaintiff about the issue. Dkt. No. 44 at 12. Ziegler believes he would have directed the plaintiff to address his medical concerns with HSU staff, just as he refers other inmates to do, because HSU staff determine sick cell status and activity. <u>Id.</u> Nor does Ziegler recall staff asking him whether they should place the plaintiff on feed cell or sick cell. <u>Id.</u> at 13. If they had, Ziegler would have told them to confirm whether the plaintiff had a restriction in place and, if there was no restriction, to direct the plaintiff to go to the dayroom to receive his meals and medications, just like every other inmate. <u>Id.</u> During the relevant time period, with the exception of the plaintiff being placed on feed cell on December 3, 20133, the plaintiff was required to leave his cell to receive his meals and medications, as there was no memo from HSU or security establishing any medical restriction. <u>Id.</u> at 12.

The plaintiff disagrees with Ziegler's assertions, and states that he was never placed on feed cell. Dkt. No. 54 at 2. The plaintiff submits that Ziegler

was aware of his condition via "kites." Id. The plaintiff asserts that he received no responses to his kites to Ziegler. Id. He acknowledges that he cannot force staff to address kites, but he believes that Ziegler is trying to set up "plausible deniability." Id.

### 2. *Anderson*

As HSU Manager, Anderson's job duties did not normally involve providing direct care to patients, and she avers that she did not provide any direct care to the plaintiff. Dkt. No. 44 at 13. According to the plaintiff, he met with Anderson on June 10, 2013, to discuss diabetic shoes, hearing test results and medications. Dkt. No. 54 at 2.

Anderson contends that she reviewed a pertinent portion of the plaintiff's medical record, and it reveals that the plaintiff was seen multiple times in the HSU during his relevant incarceration at Columbia. Dkt. No. 44 at 13. Anderson did not attach that pertinent portion of the plaintiff's medical record to her affidavit, and the defendants did not submit the plaintiff's medical records, in whole or in part, in support of their motion for summary judgment.

According to the plaintiff, Anderson allowed nursing staff to evaluate and ascertain the plaintiff's disability status. Dkt. No. 54 at 3. He believes that a doctor or specialist would have come to a different conclusion; he bases this belief on the treatment he received after December 11, 2013, when he saw a doctor. Id.

Additionally, Anderson received copies of the incident reports prepared by Nelson and Pillar on December 4, 2013, and December 12, 2013, respectively. Dkt. No. 49-3, Ex. 1002 at 3; Dkt. No. 47-1, Ex. 1004 at 3.

       3.    *Meisner*

Although Meisner had general supervisory authority over Columbia's operations, he did not supervise the day-to-day routine of individual employees, unit staff, or medical personnel. Dkt. No. 44 at 20. Meisner says he does not have personal knowledge regarding the plaintiff's medical condition, id. at 21, but the plaintiff disputes this assertion. Dkt. No. 54 at 4. The plaintiff also disputes Meisner's assertion that he was "not qualified to make medical decisions, order, or provide medical services for inmates" because "[s]uch diagnostic and treatment services are provided to inmates by the health care professionals, i.e., physicians, nurse practitioners, or physician assistants, employed at the inmate's respective housing institution, in consultation with any additional outside providers, when warranted." Dkt. No. 44 at 20. The plaintiff acknowledges that Meisner is not a medical professional, but suggests that as warden, Meisner could have ordered an independent investigation or a doctor's intervention. Dkt. No. 54 at 4.

According to Meisner, his only involvement with the plaintiff's claims consisted of his involvement in the disposition of Offender Complaint Numbers CCI-2013-23502 and CCI-2014-1030. Dkt. No. 44 at 22. As part of his duties as Columbia's Warden, Meisner acted as the appropriate reviewing authority on

certain offender complaints filed by inmates. Id.; Wis. Admin. Code § DOC 310.12.

On December 5, 2013, the plaintiff filed Offender Complaint Number CCI-2013-23502, in which he alleged that he had been refused three meals since November 30, 2013, when he requested sick cell status as a result of his left knee issues and foot pain, which he alleged staff new about. Dkt. No. 44 at 22. The ICE investigated this claim and, on December 9, 2013, after finding no staff misconduct or work rule violations, recommended that the complaint be dismissed. Id. The plaintiff submits that he was not privy to any "investigation" and suggests that nearly all of his complaints are routinely dismissed. Dkt. No. 54 at 4.

Meisner reviewed the complaint, together with the ICE's findings and recommendation, and dismissed the complaint on December 16, 2013. Dkt. No. 44 at 22. The plaintiff appealed the decision to the CCE, who recommended that the appeal be dismissed, and the Secretary adopted the CCE's recommendation. Id. at 22-23. The plaintiff disputes the assertions that the institution reasonably and appropriately addressed the issue raised and that he did not present further information on appeal that would warrant overturning Meisner's decision. Dkt. No. 54 at 4. He says he was assured that the investigation was done based upon a medical review, but he was never apprised of the information researched or the criteria on which the decision was based. Id.

16

On January 13, 2014, the plaintiff filed Offender Complaint Number CCI-2014-1030, alleging that Security Director Weber deliberately ignored his request for help, thereby exacerbating the plaintiff's pain issues. Dkt. No. 44 at 23. The plaintiff alleged that he missed meals and medications as a result. Id.

The ICE investigated the plaintiff's claims and recommended that the complaint be dismissed. Id. Meisner reviewed the complaint, together with the ICE's findings and recommendation, and dismissed the complaint. Id. The plaintiff appealed to the CCE, the CCE recommended the appeal be dismissed, and the Secretary adopted the CCE's recommendation. Id. at 23-24. Once again, the plaintiff avers that he was not privy to the investigation conducted. Dkt. No. 54 at 4. He also submits that he was not apprised of the findings specific to the dismissal of the original complaint and, therefore, could not offer further information warranting overturning the complaint. Id. at 5.

Meisner submits that he is not aware of any additional correspondence directed to him from the plaintiff related to this action and that he was never personally involved in any decisions concerning the plaintiff's medical condition, or sick cell or feed cell status. Dkt. No. 44 at 24. The plaintiff references missing correspondence but admits that he cannot prove Meisner ever saw it. Dkt. No. 54 at 5.

Meisner did receive copies of the incident reports prepared by Nelson and Pillar on December 4, 2013, and December 12, 2013, respectively. Dkt. No. 49-3, Ex. 1002 at 3; Dkt. No. 47-1, Ex. 1004 at 3.

17

F.    Plaintiff's Requests for Accommodations

The defendants presented evidence of two requests the plaintiff made for accommodations. "Special accommodations may be made for inmates with documented medical or mental health conditions." Dkt. No. 44 at 18. "An inmate requests a special accommodation by submitting a DOC-2530 Reasonable Modification/Accommodation Request form to the ADA Coordinator or designee." Id. "In order to determine whether an inmate needs a modification or accommodation, ADA staff explore the issue with the inmate, as well as related department personnel and outside providers as necessary, in order to determine whether the inmate has a documented disability." Id. at 18-19. "Subsequently, ADA staff determine whether the inmate meets the criteria for service and discern if a reasonable accommodation may be warranted to enable the inmate equal access, or equal participation in programs, services, and activities offered by the DOC/CCI, and if so, what type of accommodation." Id. at 19. "An accommodation is granted if the questions of disability and service eligibility are affirmed and if ADA staff believe a reasonable accommodation is necessary in order to enable the inmate equal access or equal participation in one or more programs, services, or activities offered by DOC/CCI." Id.

On June 16, 2013, the plaintiff submitted a Reasonable Modification/Accommodation Request form, asking to be allowed "personal shoes; soft wrist and ankle cuffs; authorization to wear personal shoes during off-site visits; employment in which he must stand or walk to keep his feet and joints extremely active; and access to law computers because of his need to

walk slowly." Id. at 19. The plaintiff claimed he "needed these accommodations because of left knee damage, diabetic neuropathy and joint issues." Id. "The HSU staff was consulted on June 20, 2013." Id.

On July 17, 2013, ADA Coordinator Hautamaki denied the plaintiff's request, indicating that the plaintiff "did not have a qualified disability in order to grant such accommodations." Id. at 20. Hautamaki noted that HSU staff saw the plaintiff for his foot issues and found "no justification for soft restraints, and state-issued shoes must be worn for off-site appointments." Id.

The plaintiff says he never met with defendant Pamela Schmidt, the Assistant ADA Coordinator, to explore issues regarding his claims. Dkt. No. 54 at 3. He also submits that ADA staff cannot make a competent determination whether an inmate meets the criteria for services or discern whether a reasonable accommodation may be warranted if the inmate is not involved in the process. Id. at 4.

On February 6, 2014, the plaintiff submitted another Reasonable Modification/Accommodation Request form; this time, he asked to be allowed "access to recreation, music, and chapel; soft cuffs; pillow; white socks; glucometer access; less painful state shoes and proper unit placement." Dkt. No. 44 at 20. The plaintiff asserted that he needed these accommodations due to painful feet, left knee, neuropathy, and joint issues, and also stated that he had Grave's Disease, diabetes, and chronic kidney disease. Id.

Schmidt consulted HSU on February 6, 2014, and denied the plaintiff's request "on the grounds that all of his concerns had been addressed by HSU

19

Manager Candace Warner on January 22, 2014." Id. The plaintiff disagrees, stating that his meeting with Warner consisted of her reciting policies and denying the plaintiff services. Dkt. No. 54 at 4. The plaintiff presented Warner with an executive order and she said she'd never seen it before. Id. She asked the plaintiff where he had gotten it and said she would look into it, but he never heard from her again. Id.

## II. DISCUSSION

### A. Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986); Ames v. Home Depot U.S.A., Inc., 629 F.3d 665, 668 (7th Cir. 2011). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." Anderson, 477 U.S. at 248. A dispute over "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

A party asserting that a fact cannot be disputed or is genuinely disputed must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an

> adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

B.     Eighth Amendment Claims

The Eighth Amendment prohibits cruel and unusual punishment and applies to the states through the Due Process Clause of the Fourteenth Amendment. Gillis v. Litscher, 468 F.3d 488, 491 (7th Cir. 2006) (citation omitted). To prevail on an Eighth Amendment claim, the plaintiff must show that the defendants denied him "the minimal civil measure of life's necessities." Id. (quoting Rhodes v. Chapman, 452 U.S. 337, 347, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981)). This includes adequate food and medical care. Farmer v. Brennan, 511 U.S. 825, 832, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). The plaintiff also must show that the defendants knew he faced a "substantial risk of serious harm" and "disregard[ed] that risk by failing to take reasonable measures to abate it." Gillis, 468 F.3d at 491 (quoting Farmer, 511 U.S. at 847).

The Seventh Circuit has concluded that missed meals do not constitute an Eighth Amendment violation when the missed meals result from the prisoner's choice not to comply with a rule. In Rodriguez v. Briley, 403 F.3d 952, 952 (7th Cir. 2005), the Court found no Eighth Amendment violation where a prisoner missed 300-350 meals in an eighteen-month period because

21

he refused to store certain of his belongings in a storage box before leaving his cell. The Court concluded that "deliberate noncompliance with a valid rule does not convert the consequences that flow automatically from that noncompliance into punishment." Id. at 953. The court found that the plaintiff could have left his cell and gone to the cafeteria at any time if he had put his belongings in the storage box. Id.

Similarly, in Freeman v. Berge, 441 F.3d 543, 544-45 (7th Cir. 2006), the plaintiff was "the author of his deprivation rather than a victim of punishment" because he refused to put on pants when his meals were delivered. "The pants requirement, violation of which was the major cause of Freeman's missed meals, imposed a condition that he could readily have complied with; he offers no excuse for his noncompliance." Id. at 545.

The plaintiff's sworn assertions in this case distinguish him from the plaintiffs in Rodriguez and Freeman. The plaintiff here did not "hold[] the keys to his own fate." Gillis, 468 F.3d at 494. He had alleged that he could not just walk down to the dayroom several times a day to get his meals and medication, because he was in excruciating pain and feared he would fall down the stairs. Thus, the court must consider whether there is a genuine dispute of material fact as to whether each defendant was deliberately indifferent to the plaintiff.

"Claims of deliberate indifference to medical needs are examined differently depending on whether the defendants in question are medical professionals or lay persons." McGee v. Adams, 721 F.3d 474, 481 (7th Cir. 2013). Medical professionals are "entitled to deference in treatment decisions

22

unless no minimally competent professional would have so responded under [the] circumstances" at issue. Id. (quoting Roe v. Elyea, 631 F.3d 843, 857 (7th Cir. 2011)).

> When a medical professional acts in his professional capacity, he may be held to have displayed deliberate indifference only if the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible actually did not base the decision on such a judgment. Deliberate indifference is not medical malpractice; the Eighth Amendment does not codify common law torts.

McGee, 721 F.3d at 481 (quotations and citations omitted).

Non-medical professionals are entitled to rely on the medical professionals' determinations. McGee, 721 F.3d at 483. "The only exception to this rule is that nonmedical officers may be found deliberately indifferent if they have reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner." Id. (quoting King v. Kramer, 680 F.3d 1013, 1018 (7th Cir. 2012) (internal quotation omitted)).

The defendants argue that they were not deliberately indifferent to the plaintiff and are entitled to summary judgment. They acknowledge that the plaintiff missed a number of meals between November 30, 2013, and December 11, 2013, but they submit that they were allowed to rely on information from medical professionals who determined that the plaintiff had no medical need for meal delivery.

The defendants also assert that there is no evidence in the record to support the plaintiff's claim that he could not leave his cell to receive meals.

23

They suggest that the plaintiff's claim amounts to disagreement with a medical professional's treatment decision and therefore does not state a claim under the Eighth Amendment. Oddly, though, the defendants did not submit the plaintiff's medical records for consideration. They rely on a description of the plaintiff's November 18, 2013 visit to the University of Wisconsin Hospital's Nephrology Clinic from a decision on an offender complaint.

The plaintiff, on the other hand, has presented evidence of many HSRs he submitted seeking treatment for pain and other medical conditions. He also provided some medical records and progress notes in response to the defendants' motion for summary judgment. The plaintiff's sworn declarations are evidence. See Lax v. City of South Bend, 449 F.3d 773, 774 (7th Cir. 2006).

The number of HSRs the plaintiff submitted and their content, as well as his decision as a diabetic to miss meals rather than navigate the stairs to get to the dayroom for his meals and medication, underscore the plaintiff's complaints of excruciating pain. The evidence the plaintiff has submitted demonstrates that there is a genuine issue of material fact regarding whether the named defendants were deliberately indifferent to the plaintiff's serious medical needs. The submissions demonstrate that there is a dispute regarding whether the named defendants ignored the plaintiff's pain and inability to navigate the stairs, and whether their turning a blind eye to that pain and inability resulted in the plaintiff's missing numerous meals between November 30, 2013, and December 11, 2013.

### 1.  *Anderson*

Anderson is a nurse, and argues that she and other HSU staff assessed the medical information available and determined that the plaintiff did not require a special shoe restriction or feed cell restriction. Anderson also averred, however, that she did not provide any direct care to the plaintiff. Dkt. No. 44 at 13. The defendants have presented no findings of fact regarding whether Anderson or any other members of the HSU staff conducted assessments of the plaintiff during the relevant time period, but Anderson suggests that she knew about the plaintiff's HSRs. It is undisputed that she received a copy of Officer Nelson's incident report on December 4, 2013. Given this evidence that Anderson knew that the plaintiff was complaining of pain and was not getting meals, a reasonable jury could conclude that Anderson was deliberately indifferent to the plaintiff's serious medical needs between November 30, 2013, and December 11, 2013. A reasonable jury also could conclude that, at least by December 4, 2013, Anderson knew about the conditions that were causing the plaintiff to miss meals, and that she failed to take some action (placing him on restriction, for example) to prevent him missing further meals. The court will deny the motion for summary judgment as to Anderson.

### 2.  *Pillar*

By December 9, 2013, when Pillar prepared his incident report, the plaintiff had missed many meals. Pillar notes that he and other staff had made several calls to the HSU to determine whether the plaintiff had a medical order to be on sick cell or feed cell. Pillar argues that he was entitled to rely on the

decisions of the medical professionals in that regard. It is true that non-medical professionals are entitled to rely on the determinations of medical professionals, but 'nonmedical officers may be found deliberately indifferent if 'they have a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner.'" McGee, 721 F.3d at 483 (quoting King, 680 F.3d at 1018). Pillar was on the unit, and knew the plaintiff was not eating. He also knew or had reason to know that the plaintiff had not been by a medical professional for at least a few days. A reasonable jury could conclude that Pillar knew, or had reason to believe, that HSU was not treating the plaintiff. A reasonable jury could find that Pillar could have stepped in to deliver meals and medication to the plaintiff or to ask that the plaintiff's status be restricted to feed cell. The court will deny the motion for summary judgment as to Pillar.

### 3. Ziegler

A genuine dispute of material fact precludes the court granting summary judgment in favor of Ziegler. Ziegler recalls that the plaintiff requested sick cell status at some point during the time period at issue in the lawsuit, but he does not recall specifics of any conversations he had with the plaintiff. Dkt. No. 44 at 12. The plaintiff submits that Ziegler was aware of his condition via "kites" the plaintiff sent Ziegler, even though the plaintiff received no responses. Dkt. No. 54 at 2. If Ziegler knew what was happening with the plaintiff—which, under the plaintiff's version of events, he may have—he could have intervened, either by seeking to have the plaintiff placed on feed cell status of making sure

he was seen by HSU staff. The court will deny the motion for summary judgment as to Ziegler.

### 4. Weber

By December 4, 2013, when he approved Nelson's incident report and commented, "HSU to follow with inmate and determine appropriate action" and referred the report to the Warden, Deputy Warden, and HSU Manager Weber knew about the plaintiff's situation," Weber was aware of the plaintiff's medical allegations and missed meals. Dkt. No. 49-3, Ex. 1002 at 2-3. Weber did not take additional action, however, until December 9, 2013, after Pillar's incident report. At that point, Weber spoke with the plaintiff and heard from the plaintiff that he had problems using the stairs due his pain and frequently missed meals because of it. Dkt. No. 44 at 11. Even then, it took until December 11, 2013, for the plaintiff to see a doctor and be moved to a housing unit without stairs and with a much shorter walk to the dayroom. Dkt. No. 44 at 12.

A reasonable jury could conclude that Weber was deliberately indifferent when he failed to act sooner to move the plaintiff or to make sure he was seen by a doctor in a timely fashion. The jury concluded that the plaintiff missed additional meals as a result of that deliberate indifference. The court will deny the motion for summary judgment as to Weber.

### 5. Meisner

Finally, the plaintiff has presented evidence that Meisner received notice of his situation when Meisner received a copy of Nelson's incident report on December 4, 2013, Dkt. No. 49-3, Ex. 1002 at 3, and when the ICE submitted

a dismissal recommendation on December 9, 2013, Dkt. No. 44 at 22. A reasonable jury could conclude that once Meisner knew about the plaintiff's missed meals, he showed deliberate indifference in failing to intervene. The court will deny the motion for summary judgment as to Meisner.

C.      Americans with Disabilities Act and Rehabilitation Act

The court also allowed the plaintiff to proceed on claims under the ADA and the RA. The defendants argue that they are entitled to summary judgment on these claims because the plaintiff did not have a qualified disability. The plaintiff responds that his diabetes qualifies as a disability under the ADA and the RA as a matter of law.

The relief available to the plaintiff under the ADA and the RA is coextensive. Jaros v. Ill. Dep't of Corr., 684 F.3d 667, 671 (7th Cir. 2012) (citations omitted). "And . . . the analysis governing each statute is the same except that the Rehabilitation Act includes as an additional element the receipt of federal funds, which all states accept for their prisons." Id. at 671-72 (citations omitted). As a practical matter, then, the court "may dispense with the ADA and the thorny question of sovereign immunity," since the plaintiff "can have but one recovery." Id. at 672 (citations omitted).

To succeed on a claim under the Rehabilitation Act, a plaintiff "must meet the threshold burden of establishing that he is 'disabled' within the meaning of the statute." Stein v. Ashcroft, 284 F.3d 721, 724 (7th Cir. 2002) (quoting Roth v. Lutheran Gen. Hosp., 57 F.3d 1446, 1454 (7th Cir. 1995)). "For purposes of the Rehabilitation Act, a person is 'disabled' if he or she 'has a

28

physical or mental impairment which substantially limits one or more of such person's major life activities.'" Stein, 284 F.3d at 724 (quoting Hamm v. Runyon, 51 F.3d 721, 724 (7th Cir. 1995)); 29 U.S.C. § 706(8)(B). "Major life activities are defined as 'functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working.'" Stein, 284 F.3d at 724-25 (quoting Roth, 57 F.3d at 1454); 29 C.F.R. § 1613.702(c).

The parties disagree regarding whether the plaintiff had a physical impairment that substantially limited a major life activity.

Diabetes is a recognized impairment under the ADA, but it is not sufficient, *per se*, to qualify as a disability. Branham v. Snow, 392 F.3d 896, 902-033 (7th Cir. 2004). "For example, a diabetic whose illness does not impair his or her daily activities, after utilizing medical remedies such as insulin, should not be considered disabled." Id. at 903 (quotations and citations omitted). In Branham, the court suggested that "[a]n individualized inquiry into each plaintiff's condition remains the rule in cases under the Rehabilitation Act and the ADA." Id.

In 2008, however, Congress enacted amendments to the ADA (ADAAA) (which became effective January 1, 2009) that broadened the definition of what constitutes a disability. Nyrop v. Indep. Sch. Dist. No. 11, 616 F.3d 728, 734 n.4 (8th Cir. 2010). "[T]he ADAAA broadened the ADA's protection by superseding portions of Sutton v. United Air Lines, Inc., 527 U.S. 471, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999) and Toyota Motor Mfg. v. Williams, 534

29

U.S. 184, 122 S.Ct. 681, 151 L.Ed.2d 615 (2002), to [] include a wider range of impairments that substantially limit a major life activity." Fleishman v. Cont'l Cas. Co., 698 F.3d 598, 606 n.3 (7th Cir. 2012).

"The ADA Amendments Act of 2008 superseded *Williams*, by expressly rejecting the court's narrow interpretation of the terms 'substantially limits' and 'major life activity' in favor of a broader interpretation." E.E.O.C. v. AutoZone, Inc., 630 F.3d 635, 641 n.3 (7th Cir. 2010).

> Part of Congress's purpose in enacting the Amendments was to make clear its intent that the determination of whether an individual has a disability under the ADA "should not demand extensive analysis." ADA Amendments Act of 2008 § 2(b)(5), 122 Stat. at 3554. Of particular note, Congress stated that the term "substantially limits" should be interpreted broadly to provide wide coverage. See *id.* § 2(a)(1), 122 Stat. at 3553.

Id.

In this case, genuine disputes of material fact preclude the court from determining as a matter of law whether the plaintiff was disabled during the relevant time period. The plaintiff swears that he was in so much pain that he could not walk to the dayroom several times a day for his meals and medication. The defendants submit that the plaintiff provided no record evidence to establish that he had a qualifying disability, and that he was provided a timely accommodation.

Determinations prison staff made at other times regarding other accommodation requests are not dispositive regarding whether the plaintiff was disabled at the time relevant to this case. It is unclear what medical

professionals evaluated the plaintiff during the relevant time period. The court has only the progress note from December 2, 2013. The next time the plaintiff saw a medical professional was his appointment with a doctor on December 11, 2013, after which he was moved to a cell without stairs and with a shorter walk to the dayroom for medication and meals.

The Seventh Circuit has made it clear that "summary judgment cannot be used to resolve swearing contests between litigants." McCann v. Iroquois Mem'l Hosp., 622 F.3d 745, 752 (7th Cir. 2010) (quoting Payne v. Pauley, 337 F.3d 767, 770 (7th Cir. 2003). Nor may the court "weigh the evidence or decide which testimony is more credible." McCann, 622 F.3d at 752 (citations omitted). Because there are genuine issues of material fact regarding whether the impact of the plaintiff's diabetes during the relevant time period rendered him "disabled" for purposes of the statutes, the court must deny the defendants' motion for summary judgment as to those claims.

## III.  CONCLUSION

The court **DENIES** the defendants' motion for summary judgment. Dkt. No. 43.

The court will contact the plaintiff's case worker and counsel for the defendants to schedule a telephonic status conference. At this conference, the parties should be prepared to discuss—next steps, such as whether they are

willing to participate in magistrate-facilitated mediation and whether they wish the court to schedule final pretrial conference and trial dates.

Dated in Milwaukee, Wisconsin this 30th day of March, 2016.

BY THE COURT:

_____

HON. PAMELA PEPPER
United States District Judge